UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


KEARNS & ASSOCIATES COMPANY, ET
AL.                                        CIVIL ACTION

VERSUS                                     NUMBER 10-439-SCR

RICKY S. CARTER, ET AL

### RULING ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT

Before the court is a Motion for Partial Summary Judgment
filed by the defendant Ricky S. Carter. Record document number 32.
Also before the court is the Plaintiff's Motion for Partial Summary
Judgment filed by plaintiff Kearns & Associates Company d/b/a Steam
& Process Repairs. Record document number 37. Both motions are
opposed.[1]

### Background

Plaintiffs Kearns & Associates Company d/b/a Steam & Process
Repairs ("Steam") and S&P Specialties Company, L.L.C. ("S&P") filed
this action against defendants Ricky S. Carter and Ricky Carter &
Associates, Inc. ("RCA") seeking damages resulting from an alleged
breach of contract and fiduciary duty. Plaintiffs alleged that
Steam entered into an agreement with Carter to form S&P, a company
that marketed and sold a product called Novalar. Carter was the
chief executive officer and managing member of S&P and was
responsible for the day to day operations.

---

[1] Record document numbers 36 and 44, respectively.

Plaintiffs alleged that in June 2009 Carter, through RCA, transferred control of sales of Novalar from S&P to RCA and then sold the product directly through his own company. Plaintiffs alleged that RCA sold Novalar to S&P at a significant mark-up rather than purchasing the product for S&P directly from the manufacturer. Plaintiffs also alleged that Carter fraudulently registered the Novalar trademark under his own name rather than in the name of S&P. Plaintiffs alleged that Carter engaged in other acts of self-dealing including: (1) unilaterally raising his salary without Steam's approval; (2) electing to lease equipment from his own separate company, RCA, to the financial disadvantage of S&P and without full disclosure and consent from the plaintiffs; and, (3) allowing S&P to pay rent that was clearly in excess of then-existing market rates.

Defendant Carter filed a counterclaim against the plaintiffs which alleged that the plaintiffs wrongfully and unilaterally ousted Carter from his manager position at S&P and terminated his employment agreement with S&P without cause. Carter sought the following: (1) a declaratory judgment that Carter owns the Novalar trademark and the product formulas; (2) specific performance and damages arising from the breach by Steam of the Agreement to Buy and Sell Agreement Membership Interests in S&P Specialties Company, L.L.C. (hereafter, "Buy-Sell Agreement") ; (3) damages for unpaid profit distributions; (4) a declaratory judgment that S&P owes

2

Carter certain profits; (5) a declaratory judgment that Steam's purported removal of Carter as the managing member of S&P was unlawful; (6) damages for failure to make 401(k) contributions; (7) damages for Carter being required to perform manual labor beyond the scope of his Employment Agreement; (8) damages for unlawful attempts to change the management and ownership of S&P; and, (9) a declaratory judgment that S&P terminated Carter's Employment Agreement without cause.[2]

Under to the terms of the Operating Agreement of S&P Specialities Company, L.L.C. (hereafter, "Operating Agreement") executed by parties, "[u]pon withdrawal [of a member of S&P], the withdrawing Member shall be entitled to the fair market value of his pro rata membership interest in the LLC which shall be determined as set forth in Paragraph 4" of the Buy-Sell Agreement.[3]

Paragraph 4 of the Buy-Sell Agreement states as follows:

> The parties have negotiated and agreed that the value of S & P is the sum shown on the attached Exhibit "A". They shall annually redetermine the value and enter the then current value on the attached Exhibit "A", or a substituted exhibit, which entry shall be valid only if

---

[2] Record document number 24, Answer, Counterclaims, and Crossclaims, ¶¶ 93 - (unnumbered) 105.

[3] Record document number 32-2, Declaration of Ricky S. Carter, attached exhibit 1, Operating Agreement of S & P Specialties Company, L.L.C., ¶ 7.3. The same agreement is found at record document number 36-1, exhibit 1A.
The Buy-Sell Agreement uses the term "Section" when referring to its provisions, but sometimes the parties use the term "Paragraph." This ruling uses the latter term except when quoting the language of the agreement.

Case 3:10-cv-00439-SCR   Document 50   11/02/11   Page 3 of 11

signed by the parties indicated by their assents and dated.

        The failure of the parties to amend the value, or to negotiate therefor, shall not invalidate this Agreement or cause its termination. However, should they fail to amend or expressly reconfirm the last value shown on Exhibit "A" for twenty-four (24) months from the date of the last valuation confirmed on Exhibit "A", then the values shall no longer be applicable to this Agreement, and the value shall then be determined as follows, unless otherwise unanimously agreed upon among the parties (or their respective successors).

        The buyer and seller shall each select a business appraiser. The two (2) appraisers shall determine the value, or should they fail to determine an agreed value within thirty (30) days, they shall appoint a third business appraiser to make the determination. The value so determined shall be binding on the parties.[][4]

Exhibit "A" was never completed by the parties. Each party subsequently appointed a business appraiser who prepared an appraisal. Carter argued that Steam is obligated to purchase his membership interest at 50% of the "value" of S&P., which he argued means the fair market value. In a footnote in his supporting memorandum, Carter asserted the use of the term "Book Value" in Exhibit "A" of the Buy-Sell Agreement was a mistake, and that the value of S&P would either be a negotiated value or an appraised value.[5]

Carter sought a summary judgment finding that the Steam is obligated under the Buy-Sell Agreement to purchase his membership

---

[4] Record document number 32-2, exhibit 2, Section 4, p. 7. The same agreement is found at record document number 36-1, exhibit 1B.

[5] Record document number 32-1,

interest for 50% of the value of S&P. Steam argued that the Carter's breach of the Operating Agreement nullified the effects of the Buy-Sell Agreement, including the mandatory sale provision. With respect to determining the value the Carter's interest in S&P, the Steam argued that a plain reading of the Buy-Sell Agreement shows that Carter is only entitled to 50% of the book value S&P, which is determined by Exhibit "A" attached to the agreement. In the alternative, the plaintiff argued that the fair market value of the Carter's membership rights in S&P is 33 1/3% of its value because he is entitled to only 1/3 of the company's distributions.

## **Applicable Law**

Summary judgment is only proper when the moving party, in a properly supported motion, demonstrates that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law. Rule 56(a), Fed.R.Civ.P.; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510 (1986). If the moving party carries its burden under Rule 56(c), the opposing party must direct the court's attention to specific evidence in the record which demonstrates that it can satisfy a reasonable jury that it is entitled to verdict in its favor. *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. This burden is not satisfied by some metaphysical doubt as to the material facts, conclusory allegations, unsubstantiated assertions or only a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.

1994). In resolving the motion the court must review all the evidence and the record taken as a whole in the light most favorable to the party opposing the motion, and draw all reasonable inferences in that party's favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. The court may not make credibility findings, weigh the evidence or resolve factual disputes. *Id.*; *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991), *cert. denied*, 502 U.S. 1059, 112 S. Ct. 936 (1992).

The substantive law dictates which facts are material. *Littlefield v. Forney Independent School Dist.*, 268 F.3d 275, 282 (5th Cir. 2001). In this case the parties' Buy-Sell Agreement is controlled by Louisiana contract law. Initially the court is required to decide whether the meaning of the plain text of the contract is clear and unambiguous. *American Electric Power Co. Inc. v. Affiliated FM INS. Co.*, 556 F.3d 282, 287 (5th Cir. 2009). "Under Louisiana law, the interpretation of an unambiguous contract is an issue of law for the court." *Apache Corp. v. W & T Offshore, Inc.*, 626 F.3d 789, 794, (5th Cir. 2010), *citing*, *Amoco Prod. Co. v. Tex. Meridian Res. Exploration Inc.*, 180 F.3d 664, 668 (5th Cir. 1999).

The interpretation of a contract is based on the common intent of the parties. LSA-C.C. art. 2045. The intent of an unambiguous contract may evaluated from the face of the document, without considering extrinsic evidence. *Preston Law Firm, L.L.C. v.*

*Mariner Health Care Management Co.*, 622 F.3d 384, 392 (5th Cir. 2010), citing, *In re Liljeberg Enters., Inc.*,304 F.3d 410, 439-40 (5th Cir. 2002). Words and phrases in a contract are to given their plain, ordinary and generally prevailing meaning. *Sims v. Mulhearn Funeral Home, Inc.*, 956 So.2d 583, 589 (La. 2007); LSA-C.C. 2047. "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." LSA-C.C. art. 2050. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LSA-C.C. art. 2046.

## Analysis

Paragraph 3 of the Buy-Sell Agreement provides that in the event of termination of Carter's employment with S&P for any reason, his membership interests in S&P must be purchased by the other members at a value to be determined in accordance with "the provisions of Section 4," which then refers to the attached Exhibit "A." The Buy-Sell Agreement does not include the term "fair market value." Although the Section 7.3 of Operating Agreement states that a member withdrawing without just cause "shall be entitled to the fair market value of his pro-rata membership interest in the LLC which shall be determined as set forth in Paragraph 4" of the Buy-Sell Agreement, this is not the situation presented in this case. Carter did not "withdraw" from the S&P. Even if Section 7.3

7

is relevant to the interpretation of the Buy-Sell Agreement, it specifically provides that the "fair market value" is to be determined by Paragraph 4 of the Buy-Sell Agreement. Because Paragraph 4 determines the meaning of "fair market value," no other definition is applicable. Carter's assertion that use of the term "Book Value" in Exhibit "A" was a mistake is not supported by either of his declarations or other summary judgment evidence.[6]

The parties were to initially and annually negotiate and agree upon the value to use in Exhibit "A." It is undisputed that the parties never completed Exhibit "A." The Buy-Sell Agreement states in Paragraph 4 that a failure to negotiate the values "shall not invalidate this Agreement or cause its termination," and provides a solution in such circumstance by specifically stating:

> ... should they [the buyer and the seller] fail to amend or expressly reconfirm the *last value* shown in Exhibit "A"...then *that value* shall no longer be applicable to this Agreement, and the *value* shall instead be determined as follows...
>     The buyer and the seller shall each select a business appraiser. The two (2) appraisers shall determine the *value* or, should they fail to determine an agreed *value* within thirty (30) days, they shall appoint a third business appraiser to make the determination. The *value* so determined shall be binding upon the parties.[7]

The term "value" used in Paragraph 4 unambiguously means the

---

[6] Carter's second declaration was filed with his memorandum in opposition to the plaintiff's Motion for Partial Summary Judgment. Record document number 44-2.

[7] Buy-Sell Agreement, Paragraph 4, p. 7 (emphasis added).

Case 3:10-cv-00439-SCR   Document 50   11/02/11   Page 8 of 11

numerical value from Exhibit "A." The numerical value to be used in Exhibit "A" is the "Book Value of S&P." Therefore, the parties intended to used the Book Value to determine the value of the parties' membership interests in S&P. Because the record does not contain any evidence indicating that the calculation method set forth in Exhibit "A" was revoked, the Book Value must be used by the appointed appraisers to determine the "value" for the purpose of Buy-Sell Agreement.

Carter's argument that the term "value" in Paragraph 4 should be interpreted as the appraised value, because it was to be determined by appraisers, is unpersuasive. The word "value," which specifically refers to the numerical value to be entered in Exhibit "A," was not amended or distinguished from its initial meaning at any later point in the Buy-Sell Agreement.[8]

Steam's argument that the mandatory purchase requirement of Buy-Sell Agreement is invalidated by the Carter's breach of the Operating Agreement is unpersuasive. The conflicting facts contained in Carter's declarations[9] and Lori Kneepel's declaration[10]

---

[8] Because the Buy-Sell Agreement, as interpreted herein, provides for a purchase price of the Carter's membership interests at 50% of the Book Value of S&P, it is not necessary to address the plaintiffs' alternative argument that the fair market value of the Carter's membership interest in S&P is 33 1/3 % of its value.

[9] Record document numbers 32-2 and 44-2.

[10] Record document number 38, Exhibit 1, Declaration of Lori Kneepel.

demonstrate the existence of genuine issues of material fact concerning the Carter's alleged breach of contract and fiduciary duties.

Steam has also failed to demonstrate that a breach of the Operating Agreement would have any effect on the Buy-Sell Agreement. The mandatory sale provision is found exclusively Paragraph 3 of the Buy-Sell Agreement and specifically states:

> In the event of the termination of Carter's employment with S & P (for any reason), Carter [] shall sell and the other member(s) shall [] buy, all of Carter's membership interest, as described below.[11]

Steam has not cited legal authority which supports it argument that a breach of the Operating Agreement permits nonperformance of the Buy-Sell Agreement. While the agreements reference each other in certain sections,[12] the agreements are independent and there is no language in either the Operating Agreement or the Buy-Sell Agreement that indicates a breach of one would invalidate the other. In fact, the Buy-Sell Agreement contains a specific provision providing exclusive terms for its termination, and does not provide for termination upon breach of the Operating Agreement

---

[11] Buy-Sell Agreement, Paragraph 3, p. 4.

[12] As discussed above, while the Operating Agreement contains a provision for purchase of membership interests upon voluntary withdrawal of a member without just cause and reference Paragraph 4 of the Buy-Sell Agreement, this clause has no effect on the Buy-Sell Agreement's mandatory sale provision.

10

or fiduciary duties.[13]

For these reasons, the court finds that the Buy-Sell Agreement requires plaintiff Kearns & Associates Company d/b/a Steam & Process Repairs to purchase defendant Carter's membership interests in S&P at 50% of its Book Value.

## Conclusion

Accordingly, the Motion for Partial Summary Judgment filed by the defendant Ricky S. Carter is denied. Plaintiff's Motion for Partial Summary Judgment is granted in part and denied in part. The court finds that the Buy-Sell Agreement requires plaintiff Kearns & Associates Company d/b/a Steam & Process Repairs to purchase defendant Carter's membership interests in S&P at 50% of its Book Value, as established by the parties' appointed appraisers or by the third appraiser appointed by them should they fail to agree on the Book Value. In all other respects, the plaintiff's motion is denied.

Baton Rouge, Louisiana, November 2, 2011.

*Stephen C. Riedlinger*

STEPHEN C. RIEDLINGER
UNITED STATES MAGISTRATE JUDGE

---

[13]   Buy-Sell Agreement, Paragraph 8, p. 9.

11